UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| North Smithfield School Department<br>*Appellant* | )<br>)<br>) |
| | ) |
| v. | ) |
| | ) |
| M.A. on behalf of P.T.X<br>*Appellee* | )<br>)<br>) |

## COMPLAINT FOR REVIEW OF SPECIAL EDUCATION DUE PROCESS HEARING

## DECISION

Appellant North Smithfield School Department ("North Smithfield") hereby appeals the decision of a Rhode Island Department of Education ("RIDE") Hearing Officer, published June 26, 2026.

### PARTIES

1. Appellant in this action is the North Smithfield School Department ("North Smithfield").

2. Appellee in this action is M.A. on behalf of P.T.X. ("Petitioner").

### JURISDICTION

3. This action is commenced under the Individuals with Disabilities Education Act (the "IDEA"), as amended, 20 U.S.C. § 1400 *et seq*.

4. This Court's jurisdiction is pursuant to 20 U.S.C. § 1415(i)(2)(A), which grants the aggrieved party the right to bring a civil action in federal district court with respect to the decision of a special education due process hearing.

5. This action regards North Smithfield's assertion that the Hearing Officer committed errors or law and/or fact when:

    a. the Hearing Officer erred, as a matter of law, when allowing the introduction of evidence of North Smithfield's alleged wrongdoing that was beyond the IDEA two-year statute of limitations and then relying on said evidence to justify granting relief to the Petitioner;

    b. the Hearing Officer acted arbitrarily and capriciously and erred as a matter of law by failing to analyze Petitioner's claims under IDEA or make any legal or factual finding as to whether FAPE had not been provided, yet still found in favor of the Petitioner;

    c. the Hearing Officer erred, as a matter of law, when applying the Consent Decree to P.T.X. in violation of the Hearing Officer's jurisdiction under the IDEA;

    d. the Hearing Officer erred, as a matter of law, when applying the terms of the Consent Decree to the facts of this case;

    e. the Hearing Officer abused his discretion when finding P.T.X. as covered by the Consent Decree as such finding relies on an interpretation of the facts that is wholly unsupported by, and contrary to, the record evidence; and

    f. the Hearing Officer abused his discretion when he ignored undisputed evidence of M.A.'s refusal to cooperate with the IEP team and obstruct the IEP process.

**RELEVANT FACTS**

**<u>Procedural History</u>**

6. P.T.X. enrolled at North Smithfield High School in September 2021 and was found eligible for special education services under an autism spectrum disorder classification on October 5, 2021.

7. P.T.X. received special education services throughout his four-year high school career under annual IEPs developed for his freshman (2021-2022), sophomore (2022-2023), junior (2023-2024), and senior (2024-2025) years.

8. On June 26, 2025, prior to North Smithfield presenting an IEP, Petitioner, filed a special education due process complaint with the Rhode Island Department of Education.

9. The complaint sought one remedy: placement at the West Bay Collaborative transition program at the Community College of Rhode Island ("West Bay CCRI").

10. On October 6, 2025, Petitioner moved to amend her complaint to allege systemic failures dating back to P.T.X.'s freshman year.

11. Respondent objected such changes on the grounds it violated 20 U.S.C. §1415(f)(3)(2) and implementing regulations 34 C.F.R. § 300.511(e).

12. Petitioner was allowed to amend her complaint.

13. A due process hearing was conducted over six days between January and March 2026. On June 26, 2026, Hearing Officer Jack Mahoney issued a decision determining that P.T.X. qualified under the Consent Decree, that North Smithfield failed to provide appropriate transition services thereunder, and ordering North Smithfield to place P.T.X. in a community-based transition program other than North Smithfield's own program. The decision is attached hereto as *Exhibit A*.

**Factual Background**

14. P.T.X. enrolled at North Smithfield High School in September 2021.

15. The school convened an eligibility meeting and found him eligible for special education services under an autism spectrum disorder classification.

16. Throughout his high school career, P.T.X. was educated in general education classes alongside his non-disabled peers, receiving pullout services and support as needed.

17. P.T.X. successfully completed all 23 credits required for a regular high school diploma.

18. P.T.X. passed all but one course over four years (a freshman-year math class).

19. P.T.X. successfully completed his senior project – a graduation requirement - which required him to work with a mentor, complete 15 hours of fieldwork, write a research paper, and present before a panel of judges for at least 12 minutes.

20. In February 2022, North Smithfield conducted a psychological evaluation of P.T.X. that found his full-scale IQ was 88, within one standard deviation of the mean and well above what is considered cogitatively impaired.

21. A speech-language evaluation conducted in March 2022 diagnosed P.T.X. with a Social Communication Disorder and recommended speech and language therapy.

22. P.T.X. received speech therapy services beginning in his freshman year, and by his senior year, he had met his communication goal and the team was "very satisfied" with his social communication.

23. In his junior and senior years, P.T.X. participated in pre-employment transition services through the Office of Rehabilitative Services ("ORS"), including work experiences at Savers and Walgreens.

24. These vocational evaluations demonstrated that P.T.X. was "excellent at staying busy and keeping up his stamina to work consistently through a shift," that he worked at a pace

comparable to 90 percent of paid employees, and that his communication was appropriate for the workplace 100 percent of the time.

25. In February 2025, Petitioner first raised the possibility of P.T.X. attending a fifth-year transition program. At that time, both Special Education Director Christine Welch ("Ms. Welch") and case manager David Daignault ("Mr. Daignault") indicated that P.T.X. would be a good fit for North Smithfield's transition program.

26. Petitioner expressed a preference for the West Bay CCRI program.

27. It was communicated to Petitioner that North Smithfield had its own transition program, and that an IEP meeting would be scheduled to develop a fifth-year transition IEP.

28. From May through early September 2025, Petitioner repeatedly cancelled or failed to respond to North Smithfield's attempts to schedule a tour of the transition program or hold an IEP meeting.

29. On June 26, 2025, Petitioner filed a due process complaint seeking placement at West Bay CCRI without ever having toured North Smithfield's program or participated in an IEP meeting to develop the fifth-year plan.

30. An IEP meeting was finally held on September 4, 2025, at which North Smithfield proposed a fifth-year transition IEP.

31. The fifth-year transition IEP included work readiness and financial management goals, small-group instruction in pre-employment and independent living skills, community-based experiences including work placement with a job coach, and supplementary aids and services including social skills training, workplace communication instruction, food shopping, and cooking.

32. Petitioner's only stated objection at the September IEP meeting was the location of the program within the high school building.

33. North Smithfield conducted additional transition assessments in November 2025 and convened for another IEP meeting on December 22, 2025, offering an updated IEP with increased service hours.

34. Petitioner stated her only complaint was that the team did not consider all of P.T.X.'s strengths in addition to the location of the program, but refused to elaborate further.

35. Petitioner did not raise any other concerns at the IEP meeting, instead her attorney "reserved" other concerns for the hearing.

36. Petitioner refused to send P.T.X. to the North Smithfield program, keeping him home throughout the 2025-2026 school year pending the due process hearing.

<u>Facts pertaining to Decision – Statute of Limitations</u>

37. Within his decision the hearing officer erroneously conflated P.T.X.'s birthday with the IDEA statute of limitations.

38. The hearing officer provided an itemization of school department's failure to provide the student with appropriate transition services stating that such services "should have begun when P.T.X. reached his ***fourteenth Birthday.***" *Ex. A at p. 19* (emphasis added).

39. That Person Centered Planning should have begun "by ***age fourteen***." *Id.* (emphasis added).

40. A career development plan and individual learning plan should have been provided to the student "by ***age fourteen***." *Id.* (emphasis added).

41. Those documents should have been used "to prepare an IEP ***over the years.***" *Id.* (emphasis added).

42. Petitioner's due process complaint and case-in-chief relied heavily on allegations from beyond the two-year statute of limitations.

43. The student's fourteenth birthday is March 9, 2020 – five years before the filing of the due process complaint.

44. The relief granted by the hearing officer explicitly and impermissibly relied upon his findings that occurred well outside the two-year statutory limitation.

45. Doing so, the Hearing Officer committed an error of law.

<u>Facts Pertaining to Decision – Consent Decree</u>

46. The Hearing Officer determined that the Consent Decree applied to P.T.X.

47. The Consent Decree is an agreement entered into by the United States and the State of Rhode Island, C.A. No. 1:14-cv-00175-JJM-PAS, in response to the U.S. Department of Justice's finding of violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., as interpreted by the Supreme Court in the matter of Olmstead v. L.C., 527 U.S. 581 (1999).

48. North Smithfield School Department is not a party to the Consent Decree.

49. The Consent Decree prohibits any person or entity from asserting any claim or right as a beneficiary or proactive class under the Consent Decree in any civil, criminal, or administrative action.

50. The Consent Decree defines Individuals with Intellectual or Developmental Disabilities ("I/DD") as:

"Persons who are eligible or likely to be found eligible, for publicly-funded developmental disability services through the Department of Behavioral Healthcare, Developmental Disabilities & Hospitals ("BHDDH") as defined in Rhode Island General Laws § 40.1-21-4.3(5) *or* <u>students</u> who are eligible or likely to be eligible for

transition services and supports under the Individuals with Disabilities Education Act, *and* who meet the definition found at 34 C.F.R. § 300.8(c)(6)**.**"

(emphasis added).

51. The Consent Decree thus establishes two independent classes of covered persons: (1) persons eligible for BHDDH services as defined by state law; or (2) IDEA-eligible students who also meet the federal definition of intellectual disability.

52. The second class, which uses the conjunction "and" expressly requires an intellectual disability.

53. The regulation at 34 C.F.R. § 300.8(c)(6) defines "intellectual disability" as "significantly subaverage general intellectual functioning, existing concurrently with deficits in adaptive behavior and manifested during the developmental period, that adversely affects a child's educational performance."

54. 34 C.F.R. § 300.8(c)(6) requires more than a diagnosis or general learning challenges.

55. The Hearing Officer acknowledged that P.T.X. has an IQ of 88, which is less than one standard deviation below the mean and falls in the low-average range.

56. The Hearing Officer further found that P.T.X. "is not intellectually disabled." This finding is dispositive of the second class.

57. Because P.T.X. indisputably does not meet the definition at 34 C.F.R. § 300.8(c)(6), he cannot qualify under the Consent Decree through the second class.

58. P.T.X. does not meet the statutory definition for BHDDH developmental disability services as required for the first class of persons covered under the Consent Decree.

59. The first class requires that an individual meet the definition of R.I. § 40.1-21-4.3 "adults with intellectual or developmental disabilities."

60. Rhode Island General Laws § 40.1-21-4.3 defines "adult with intellectual or developmental disabilities" in relevant part as:

"a person, eighteen (18) years old or older and not under the jurisdiction of the department of children, youth and families who is either an adult with intellectual or developmental disabilities or is a person with a severe, chronic disability that:

(i) Is attributable to a mental or physical impairment or combination of mental and physical impairments;

(ii) Is manifested before the person attains age twenty-two (22);

(iii) Is likely to continue indefinitely;

(iv) *Results in substantial functional limitations in three (3) or more of the following areas of major life activity:*
A. *Self care;*
B. *Receptive and expressive language;*
C. *Learning;*
D. *Mobility;*
E. *Self-direction;*
F. *Capacity for independent living;*
G. *Economic self-sufficiency;* and

(v) Reflects the person's need for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services that are of lifelong or extended duration and are individually planned and coordinated."

(emphasis added).

61. The statute's plain language establishes five conjunctive requirements, including that the disability *"results in substantial functional limitations in three (3) or more"* enumerated life activities. (emphasis added)

62. The Hearing Officer determined that P.T.X. met this requirement, finding substantial functional limitations in self care, self direction, capacity for independent living, and economic self-sufficiency.

63. The mere existence of an area of need does not establish a "substantial functional limitation."

64. The Hearing Officer's finding that P.T.X. has a substantial functional limitation in self care rests entirely on Petitioner's representations in her BHDDH application and ignores four years of daily observations by school personnel.

65. Three expert witnesses who worked directly with P.T.X. throughout his high school career testified that he did not have a substantial functional limitation in self care.

66. School psychologist Maria Rego, who evaluated P.T.X. cognitively and behaviorally, testified that although he occasionally came to school in clothes that were somewhat tight, she observed nothing suggesting a substantial functional limitation in self care.

67. Case manager Mr. Daignault, who regularly observed P.T.X., testified that P.T.X. arrived at school, used the bathroom, washed his hands, and managed similar daily tasks independently.

68. Special Education Director Ms. Welch testified that at school, P.T.X. used the bathroom independently, used school technology to obtain a hall pass when needed, ate in the cafeteria without support, and participated in unified volleyball and basketball, which required him to change clothes independently to prepare for games.

69. The record further shows that P.T.X. successfully and independently utilized the bathroom at school for four years and used the electronic hall pass system to check himself out of class.

70. P.T.X.'s vocational evaluations reflected appropriate workplace communication and none of his teachers nor his evaluators reported difficulty understanding him or being understood by him.

71. Petitioner's own evidence contradicts a finding of substantial functional limitation. A pass worker renewal service plan from February 2025 showed that P.T.X. independently

followed the steps of cooking and baking 71% and only required two verbal prompts the remainder of the time. He maintained adequate personal space while interacting with others, independently initiated and ended conversations, used an appropriate speaking volume, and independently took turns and allowed others to take turns during games or activities.

72. P.T.X. was exited from his communication goal during his senior year because he had met it.

73. Speech-language pathologist Nancy Raucci, who worked directly with P.T.X. from his sophomore through senior year, testified that he could be understood by others and could understand others speaking to him.

74. This documented progress is inconsistent with a substantial functional limitation in self care.

75. The Hearing Officer's findings as to learning, self-direction, and economic self-sufficiency similarly lack record support.

76. With respect to learning, the record demonstrates that P.T.X. has an IQ of 88, completed all graduation requirements on time, failed only one math class in freshman year, and otherwise met the general education graduation requirements at the conclusion of his senior year.

77. P.T.X. successfully completed the senior project, which required him to communicate with a mentor, write a research paper, and present to a panel of judges.

78. P.T.X. did not require daily help with new behaviors or newly learned skills.

79. P.T.X. was identified by several experts as "a pretty quick learner" who, after being shown how to do something and given a few practice opportunities, was able to acquire new skills.

80. This evidence is inconsistent with a substantial functional limitation in learning.

81. With respect to self-direction, P.T.X. did not require help with daily social activities, making decisions, or staying safe.

82. P.T.X. did not require ongoing daily help with safety, engaging in preferred activities, navigating social situations, or making appropriate decisions when complying with instruction.

83. P.T.X. was successful at school, sought help from teachers and case managers when needed, and according to his vocational evaluations, did not need prompting to ask questions or seek help on the job site.

84. Petitioner's own pass worker renewal service plan showed that P.T.X. could independently identify strangers and interact with them appropriately, and remained by a supervising adult's side or informed an adult when going out into the community.

85. The Pre-ETS evaluation indicated that P.T.X. scored in the average range for employee performance at work, and those results indicate that P.T.X. is likely to learn new tasks as quickly and accurately as most people, has strong problem-solving abilities, and is easily trained and upskilled.

86. P.T.X. worked appropriately with colleagues and customers.

87. The ORS evaluation found that P.T.X. met expectations 80 percent of the time as it related to accuracy in assigned tasks, met employer expectations for working consistently during his shift, and adequately met employer expectations for new skill acquisition.

88. P.T.X.'s ability to learn and independently use a point-of-sale system while at work was indicative of his ability to be economically self-sufficient.

89. This evidence directly contradicts a finding of substantial functional limitation in economic self-sufficiency.

90. P.T.X. could cook and clean with substantial independence, contradicting Petitioner's assertion that P.T.X. requires physical assistance and total support to prepare a cold meal or prepare a simple meal.

91. P.T.X. successfully navigated the high school independently for four years, managed his class materials, and successfully completed his senior project.

92. While there are some weaknesses in this area, they did not rise to the level of substantial functional limitation.

93. The Hearing Officer's application of the Consent Decree was a clear error of law because:

    a.   The Hearing Officer does not have the jurisdiction to enforce the Consent Decree as the Consent Decree was brought under the ADA and the Hearing Officer exercises jurisdiction solely under the IDEA.

    b.   North Smithfield is not a party to the Consent Decree.

    c.   The express terms of the Consent Decree outline that no party or entity may assert a claim or right as a beneficiary or protected class under the Consent Decree in any administrative action.

    d.   The Hearing Officer committed errors of law when applying the definitional terms of the Consent Decree, interpreting any IDEA eligible student with a developmental disability qualifies, reads the "and who meet the definition found at 34 C.F.R. § 300.8(c)(6)" language out of the Consent Decree entirely.

e. The Hearing Officer adopted Petitioner's expert's legally erroneous interpretation that a student with autism automatically qualifies under the Consent Decree regardless of IQ or functional limitations.

f. The Hearing Office abused his discretion when finding that P.T.X. exhibited substantial functional limitations in three or more life areas as required by the Consent Decree.

<u>Facts Pertaining to Decision – FAPE</u>

94. Even in the event that P.T.X. would have qualified under the Consent Decree, which North Smithfield argues that P.T.X. does not, the Hearing Officer's failure to determine whether a FAPE was denied is an error of law and is arbitrary, capricious, and a clear error of judgment.

95. Each of P.T.X.'s annual IEPs satisfied the appropriate standard.

96. From freshman through senior year, North Smithfield followed a consistent, IDEA-compliant approach: it relied on assessment data, educational evaluations, observations, and parent input to identify needs; it developed goals and services responsive to that data; it delivered specially designed instruction and related services targeted at those needs; and P.T.X. made documented progress.

97. The Freshman IEP drew on a 2019 private neuropsychological evaluation, teacher observations from the first month at North Smithfield, and two transition assessments (Career Clusters Interest Survey and Student Dream Sheet).

98. When concerns about social skills emerged, the Freshman IEP was revised in March 2022 to include a communication goal focused on social communication after a psychological evaluation and speech-language evaluation were conducted.

99. The Sophomore IEP incorporated three new transition assessments (Self-Assessment/Self-Advocacy Checklist, Career Clusters Interest Survey, Career Priorities Profile) and a psychological evaluation showing strengths in visual-spatial skills but weaknesses in working memory. The communication goal continued to target social pragmatic language, and P.T.X. received pullout services to work on study skills, homework, course-load management, and use of online technology to track assignments.

100. The Junior IEP incorporated additional transition assessments (Comprehensive High School Transition Survey, Transition to Work Inventory) and added a work-completion goal based on identified need. The communication goal was modified based on the speech-language pathologist's data-driven judgment that P.T.X. had not made sufficient progress on the prior benchmarks.

101. The Senior Year IEP incorporated further transition assessments (Casey Life Skills, Ability Explorer, O*NET) that were used to shape transition programming. The writing goal was adjusted to align with the writing demands of the senior project and graduation requirements. The communication goal was discontinued after P.T.X. met it, with the team very satisfied with his social communication, and a consultative model was implemented to ensure maintenance of skills.

102. This repeated linkage between current assessment data, present levels, and selected goals and services is precisely what makes an IEP "reasonably calculated" rather than conclusory or static.

103. P.T.X. made progress over time in the areas targeted by his IEPs, supporting the conclusion that the plans were calculated to enable progress appropriate in light of his circumstances.

104.    Over two IEP meetings in September and December 2025, North Smithfield developed a data-driven fifth-year transition IEP based on multiple transition assessments, input from teachers and staff who knew P.T.X., and parental input to the extent Petitioner participated.

105.    The team also identified specific post-school employment needs.

106.    Based on the ORS evaluations, P.T.X. needed support in increasing independent job skills, staying on task, and improving job-readiness skills such as time management. The evaluations showed he benefited from tasks being verbally explained and modeled. The team identified independent-living needs based on Petitioner's observations and the Transition Planning Inventory, including growth in buying everyday items, paying bills, using bank accounts, budgeting money, using local transportation, and navigating the community.

107.    The team then translated those needs into two targeted goals. First, the work readiness goal was designed to increase P.T.X.'s job skills and responsibilities while participating in vocational activities, targeting his ability to work through frustration, complete tasks to expected quality, seek assistance when needed, and demonstrate awareness and acceptance of job expectations.

108.    This goal directly tracked the needs identified in P.T.X.'s vocational evaluations. Data would be collected by both the special education teacher and the job coach, who would observe P.T.X. in the employment setting and use those observations to refine explicit classroom instruction. Second, the IEP included a goal to increase P.T.X.'s understanding of financial planning and money management through classroom and workplace activities. The instruction was practical and community based, with P.T.X.

practicing skills such as making a grocery list, locating items in a store, and completing purchases. The goal targeted planning and budgeting purchases, using cost-saving strategies, and understanding how and when to pay bills.

109.     The IEP set out how those goals would be delivered. P.T.X. would receive 1.5 hours per day of small-group, explicit instruction in pre-employment and independent living skills. He would also participate in community-based experiences for three hours per day to support work readiness and independent living, including grocery shopping, going to the theater, and other community activities. In addition, P.T.X. would have a dedicated job coach while on a job site, working a minimum of two hours a day for eight hours a week.

110.     The IEP offered was reasonably calculated to enable P.T.X. to make progress in light of his circumstances.

111.     The program offered a full-time job coach, a full-time teacher equipped with a life skills kitchen and laundry area, and community events.

112.     When Petitioner raised concerns about life skills, North Smithfield was willing to accommodate those concerns.

113.     Petitioner participated in IEP meetings and had ample opportunity to raise concerns about P.T.X.'s independent living skills.

114.     Petitioner's only complaint during the September IEP meeting was relating to the location of the transition services, not the services actually being provided.

115.     Placement decisions must be made "as close as possible to the child's home." 34 C.F.R. § 300.116(b)(3).

116. The Hearing Officer's decision characterizes the North Smithfield transition program as inappropriately restrictive rests only on the fact that the explicit instruction occurs at the high school building.

117. Multiple school districts in Rhode Island house transition programs on high school campuses, including Burrillville, Cumberland, Lincoln, Woonsocket, North Providence, West Warwick, Coventry, Ponagansett, East Greenwich, and North Kingstown.

118. A transition program at a high school is common and not discriminatory or restrictive.

119. The Hearing Officer's decision is devoid of any FAPE analysis.

120. The entirety of the Hearing Officer's Order constitutes clear legal error and is arbitrary and capricious because it fails to conduct the required FAPE analysis. The Order contains no mention of a Free Appropriate Public Education or a FAPE, nor does it provide any analysis, legal findings or factual findings pertaining to a FAPE which is required to determine if a FAPE was provided. Because the determination of the issues before the Hearing Officer require a determination of whether the child received a free appropriate public education pursuant to 20 U.S.C. § (f)(3)(E)(i) the absence of such analysis renders the Order legally deficient.

<u>Facts Pertaining to Decision – Petitioner's Obstruction of the IEP Process</u>

121. Petitioner harbored a fixed purpose from the outset: to effect an out-of-district placement for P.T.X. at North Smithfield's expense.

122. When Ms. Welch informed Petitioner in February 2025 that North Smithfield had its own transition program and that it would be a good fit for P.T.X., Petitioner immediately expressed interest in the West Bay CCRI program instead.

123.     From that point forward, Petitioner systematically avoided North Smithfield's attempts to develop an IEP or showcase its program.

124.     Ms. Welch repeatedly attempted to schedule a tour of the North Smithfield transition program.

125.     Ms. Welch attempted to coordinate a tour of the North Smithfield transition program with petitioner upwards of five times, each time being met with no response from Petitioner.

126.     After her several attempts to schedule a tour, understanding that the summer break was approaching, Ms. Welch attempted to schedule an IEP meeting to discuss the transition program.

127.     On June 2, 2025, Petitioner finally connected with Ms. Welch and made clear that despite it not impacting P.T.X.'s ability to continue for a fifth year, P.T.X. would not be participating in graduation ceremonies.

128.     Petitioner further stated that while they both agreed a transition program was necessary, they disagreed about location, and that Petitioner would be "seeking assistance."

129.     Ms. Welch perceived that Petitioner was refusing to cooperate or participate in the IEP process because she wanted P.T.X. placed at West Bay CCRI.

130.     Petitioner then responded to Ms. Welch's request to schedule an IEP meeting with a due process complaint.

131.     The Initial Complaint's sole remedy was to place P.T.X. at West Bay CCRI.

132.     At the time of the filing, no IEP document had been offered to Petitioner, nor had she toured the North Smithfield program.

133.      After a resolution meeting on July 15, 2025, the parties agreed to hold an IEP meeting. Ms. Welch offered various dates, but due to Petitioner's lack of response as to her availability, the IEP meeting was scheduled for September.

134.      Ms. Welch offered dates in July, but Petitioner would not attend.

135.      The several-months-long refusal to attend an IEP meeting demonstrates that Petitioner formed a fixed preference for the West Bay CCRI program before any meaningful engagement with North Smithfield's proposed program and was willing to halt the IEP process in order to achieve her preferred placement.

136.      When the September 4, 2025 IEP meeting finally occurred, Petitioner's sole objection was the location of the program within the high school building.

137.      North Smithfield offered job placements in the community and explained that most of P.T.X.'s day would be spent outside the building, but Petitioner remained fixated on the fact that explicit instruction would occur at the high school.

138.      At the December 22, 2025 IEP meeting, after North Smithfield had increased service hours. Petitioner stated her only complaint was that the strengths of P.T.X. were not adequately captured in the IEP document but did not further elaborate.  Her attorney "reserved" other concerns for the hearing instead of attempting to resolve these issues at the IEP meeting.

139.      This refusal to engage substantively with the content of the proposed IEP—coupled with the insistence on a predetermined placement—is precisely the conduct that bars relief under the IDEA.

140.      Petitioner refused to send P.T.X. to the North Smithfield transition program, keeping him home for the entire 2025-2026 school year while the litigation was pending.

141.   This unilateral decision to withhold P.T.X. from any educational programming was made despite North Smithfield's offering of a transition IEP in both September and December 2025.

142.   Here, any educational loss P.T.X. experienced during the 2025-2026 school year is due solely to Petitioner's intentional decision to keep him at home rather than allow him to participate in the proposed transition program.

143.   Petitioner was well represented by an educational advocate and then an attorney during the two IEP meetings she attended in September and December 2025.

144.   The Hearing Officer abused his discretion when he ignored this undisputed evidence of M.A.'s refusal to cooperate with the IEP team and obstruct the IEP process.

## CLAIMS FOR RELIEF

### <u>Count I</u>

145.   Plaintiff hereby incorporates Paragraph Nos. 1 through 144 as fully restated herein.

146.   Plaintiff is aggrieved by the findings and decision of the Hearing Officer under 20 U.S.C. §§ 1415(i)(2) and (3).

147.   In light of the testimonial and documentary evidence, it is apparent that the that the Hearing Officer was without jurisdiction to apply the Consent Decree in this matter; that the Consent Decree did not apply to P.T.X. both as a matter of law and fact; that the decision impermissibly relies on evidence and findings that occurred outside the two year statutory limitation in violation of 20 U.S.C. § 1415(f)(3)(C), that the hearing officer failed to analyze as to whether a FAPE was provided in violation of 20 U.S.C. § 1415(f)(3)(E)(i), and that regardless of the lack of such analysis it is clear from the record that North Smithfield provided P.T.X. with a FAPE.

148.     This Honorable Court's standard of review is one of "involved oversight" which "falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 36 (1st Cir. 2012).

**PRAYER FOR RELIEF**

WHEREFORE, Appellant North Smithfield School Department  respectfully requests that this Honorable Court grant the following relief:

1. Reverse the decision of the Hearing Officer as the Court deems just.

2. Determine that Appellant is the prevailing party pursuant to 20 U.S.C. §1400 et seq., and/or other applicable law.

3. Award Appellant any other damages or relief available under applicable law, including but not limited to attorneys' fees.

4. Such other and further relief this Court deems just and proper.

5. Enjoin the implementation of the Hearing Officer's Decision pending the Court's decision in this matter.

Respectfully submitted,

Dated: July 24, 2026                         Sean J. Clough

*/s/ Andrea I. Staehelin*
Andrea I. Staehelin, Eq. #10953
BRENNAN SCUNGIO & KRESGE LLP
362 Broadway
Providence, RI 02909
P: (401) 453-0233
E: astaehelin@bskllp.com