The Rhode Island Department of Education

PTX

v                                                                    LL 25-14

North Smithfield School Department

<u>Decision</u>

1.      <u>Procedural History</u>

In 2025 M.A., the mother of PTX, filed this special education due process complaint against the North Smithfield School Department. In July, 2025 mom retained an attorney to represent the interest of both her and her son. There were six hearing dates between early January and early March, 2026. The parties submitted extensive legal memoranda by early June 2026.

2.      <u>Factual History</u>

PTX was born on March 9th, 2006. He is currently 20 years old (P1 Exhibit 1). Mom has full legal guardianship of her son. Guardianship was attained because PTX did not know how to take care of everyday living (P14, 15).

PTX started high school at North Smithfield High School as a freshman, and an IEP meeting was held on October 5th, 2021. The student qualified for special education services. He was diagnosed with autism spectrum disorder. PTX went to parochial schools St. Phillips and

1

Good Shephard from kindergarten through eighth grade. PTX had a 504 Plan in both schools (P29, 31).

3.    Issue: Did PX Receive Appropriate Special Education Transitional Services Under the Facts of this Case?

4.    Petitioners Claim

  a.    Testimony of Student's Mother, M.A.

Exhibit 6 is a copy of the student's November, 2021 IEP (ninth grade). PTX was receiving failing grades and was not adapting well in school socially. PTX would sit by himself at lunch (P40, 41). Mom did not know what transition assessments were. No one told her how transitions worked (P42-44).

Mom shared with the IEP team her concern about social issues. Her son came home from school many days upset, withdrawn, and sometimes crying. Exhibit 9 is a November 18th, 2021 email from mom who wrote to the school's representatives. She wrote that her son "... was being set-up to fail."

Exhibit 10 is a parent conference report that was prepared concerning changes in PTX's curriculum. It was changed to fundamentals of English, history, and an independent living course. These changes were designed to provide PTX with more support throughout the day.

Exhibit 13 is a school psychological evaluation prepared by examiner Maria Rego of North Smithfield. The reports date is November 15th, 2022 (the student's freshman year). The report reiterated  moms concern that her son was having difficulty making friends, and not

willing to participate in groups. Mom did not know what the school had done to address these social skill issues (P54).

Exhibit 19 is the November 2022-2023 IEP (sophomore year). There is no independent living reference in the IEP, and the student was to improve his social communications as measured by classroom observations and teachers reports. At the commencement of her son's sophomore year, mom did not know her son could receive special education services until he turned twenty-two (P62).

PTX was administered a neuropsychological exam in September, 2023 (junior year). Mom had concerns about delays in his social pragmatics and education. He continued having trouble engaging with other people and feeling isolated (P66, 67). PX resisted showering, using deodorant, and changing clothing. He struggled to understand money. He had difficulty following multi-step instructions and daily adaptive skills (P67). The student rated himself as average, but his parents and teacher disagreed with this assessment.

In his junior year, the goal for PTX from the school's perspective was for him to graduate from high school. There was no understanding as to the ramifications between receiving special education services and receiving a diploma and graduating (P75).  At the end of his junior year PTX was struggling with feeling emotionally and socially awkward and finding it difficult to make friends (P78).

The student's mom disagreed with answers to questions provided by her son to the extent that he could make a list of groceries and compare prices; make healthy meals with or without a recipe and understand aspects of his eligibility for health insurance, social security, and Medicaid benefits. Mom also took issue with her son's belief that he could build new relationships and create a living daily budget. Mom rejected her son's belief that he could go into a store and buy

3

something on his own (P82, 84, 85). Mom learned that her son could not graduate from high school while continuing to receive special education services. She obtained this information from talking to a parent one day (P90).

In late 2024 or early 2025, mom requested a conference. The conference over the phone was held on February 10th, 2025 with Ms. Welch and Mr. Daignault, teachers at the school. Both educators thought that a transition program at North Smithfield would be a great fit for PTX. Mom asked about the CCRI Transition Program, but it was made clear to her that North Smithfield would be recommended, not the program at CCRI (Exhibit 36). At the time of the February 10th, 2025 meeting, mom was told that she would receive an email indicating that a new IEP could be written in August, 2025 to outline student's goals in the transition program at North Smithfield the following academic year (Exhibit 36).

PTX did not graduate in June, 2025. He chose not to, because he would be embarrassed to cross the stage without a diploma. Mom did not remember whether there were any IEP meetings between March 2025 and August of the same year (P96).

Mom was advised over time that the transition program at North Smithfield would be about two or three hours a day for four days a week. Mom believed her son needed a full day to learn, not merely two to three hours (P98, 99). M.A. ( mom) wanted the CCRI Transition Program. It was located on a college campus, and the program was five days a week. The school had a variety of programs built for the students (P100). Mom did not want her son to remain in the North Smithfield High School building, because he was already feeling socially excluded (P702). Mom knew that there were only two kids in the North Smithfield Transition School, one of whom had down syndrome. It was understood that lunch would be eaten with a transition teacher (P103, 104, 105). An IEP was created in September, 2025 (Exhibit 40). Mom attended a

4

December 2025 IEP meeting, but she was still not satisfied with the lack of social communication and living skills her son would receive (P113).

Cross examination of M.A. was reserved by the defense and did not begin until days after direct examination was completed. In cross examination mom reiterated that her son needed help to go to the bathroom and shower. In particular, there were issues with wiping himself (P603). Mom believed her son was significantly impaired in social interactions. He is not able to make and keep friends (P636).

b.      Testimony of Dr. Pamala Potemri

Dr. Potemri has qualified as an expert in language based learning disabilities, transition, and administration. Dr. Potemri explained that the consent decree addressed the fact that individuals with intellectual and developmental disabilities were often times not prepared properly through the transition process. The consent decree was an effort to expand inclusive opportunities and eliminate that sheltered working mentality (P128). The students who transitioned to a four year school, trade school, or a work environment of some sort are not going back to high school (P132). The witness was familiar with the requirement of transition in the Individual Disabilities Education Act (IDEA). The process of transition begins at the age of fourteen (P134). The consent decree relates to students with intellectual and developmental disabilities. Autism is an example of a developmental disability. Adaptive living skills are daily living skills, and some kids hold their own academically but do not function well in their adaptive function skills (P137, 138).

The basis of the consent order is Person Centered Planning (PCP). PCP is the first step in getting the big picture of what the student expects their life to be (P139, 140). Transition services

are important, because when you graduate from high school, you no longer qualify for said services. When a child with an IEP reaches fourteen, everything in the IEP is focused on transition (P142). PCP is part of the consent order (P149). Results of the PCP are embodied in an actual plan that is prepared and given to the IEP team (P151). The IEP is really a supportive document in the direction that the PCP is going (P154).

Transition services should be specific to goals, and goals should be driven by the PCP (P162). Dr. Potemri was at the September 4th, 2025 IEP meeting (P163). The problem with the September 2025 IEP was that there were no initial benchmark rubrics for independent living that were established (P172).

The witness was surprised that PTX did not qualify for extended school services in 2025. Regression during the summer can occur to a student both socially and emotionally. Trial work should be based on the PCP and has to be interest based. In PTX's case, you build from his general area of interest of welding and working with pets (P182, 183). PTX underwent a trial work experience for one week at Walmart in his junior year, and at Savers in his senior year. The experience was not based on his interest areas of welding and working with pets and other animals (P183, 185). Dr. Potemri testified that the proposed IEP's in September 2025 and December of the same year did not contain transition services that measured up to the IDEA and the consent order (P192, 193). The September, 2025 IEP did not contain a PCP, and was based on insufficient assessments and an inadequate IEP.

Dr. Potemri thought that the CCRI Transition Program would be suitable for PTX. The witness liked the idea of a campus where students attend classes in what she would consider to be the least restrictive environment. The CCRI Program would provide independent living skills

and social/emotional learning. The CCRI Program is comprehensive and addresses the socialization piece (P195).

Dr. Potemri continued her testimony three days after it began. She testified that autism spectrum qualifies as a developmental disability (P212). The student's prior job experiences, as referenced above, did not conform with his general interests (P240, 241). Dr. Potemri thought that placement pursuant to the consent decree should be off of the high school campus (P244). The intent of the consent decree is to ensure that continued segregated self contained work shop type models are not the norm (P247).

Dr. Potemri, when speaking to PTX, did observe social and communication deficits. There was no back and forth in terms of a conversation with PTX (P253, 254). The witness believes that autistic students are more prone to isolation. They have a tendency to lack the ability for communication skills and social navigation (P264). They need structure whether it is in academics or a work environment (P265). The witness opined that the assessments given to the student were not enough to develop an IEP.

Dr. Potermi addressed her concern about the September 2025 IEP meeting. There was a lack of assessments. There was no PCP; only the student responded to the Casey Life Skill Assessment, and the goals in the IEP were vague and disconnected.

Dr. Potemri thought that the summer, 2025 would have been a great time to start the transition program. The expert theorizes that everyone thought the student would graduate, so there was no planning for transitions, no updated IEP, and nothing done in the summer of 2025 (P275).

5. Respondents Defense

a.    <u>Testimony of Maria Rego</u>

Ms. Rego testified that she is a school psychologist at North Smithfield. She performed a psychological evaluation of PTX in February 2022 (Freshman year). PTX's IQ was low average, and there was a discrepancy between his working memory and his visual-spatial scores (P 299). PTX exhibited elevations in attitude to teachers, resulting in clinical significantly depressive anxiety and somatization. Ms. Rego suggested PTX has a weakness in attention and needs redirection. The student needs to be retaught in certain areas, and should receive frequent check-ins (P302).

b.    <u>Nancy Raucci</u>

Mrs. Raucci is a speech and language pathologist at North Smithfield. She works in the high school and middle school. The witness testified that PTX's language deficits in 2023 were minor (P366). PTX did have an issue with social communication. He did not have a substantial fundamental limitation in the area of communication (P370, 371).

c.    <u>David Daignault</u>

Mr. Daignault is the current chair for the special education department (P414). The witness was PTX's case manager in his sophomore through senior year (P438). By state law if the student receives a diploma, the special education services, including transition, end (P463).

The student had many conversations with the witness about the military and military equipment (P492). PTX was interested in welding and Mr. Daignault tried to talk to him about working with his hands and eyes to control equipment (P349, 491). The student talked to the

8

witness about his interest in dogs and potentially becoming a part time groomer (P494). By November 2024, the student's senior year, the plan was to have the student graduate from high school that June (P496, 497). The witness, Mr. Daignault, did not think that a transition program in a fifth year of high school was warranted until he talked to mom a couple months after the IEP (November 2024) was prepared (P498). Mr. Daignault thought that the North Smithfield transition program would be a good fit for the student (P499). PTX's diploma would be received once he finished the transition program (P500). The witness had no concerns about the student's ability to care for himself, and he had no substantial limitations regarding self care (P512).

Exhibit 70 is PTX's freshman IEP. He was in a small pullout class in math, writing, and general support. There were no special social skills goals and it was not something that required an annual measurable goal (P534).

Exhibit 24 is the student's junior year IEP. The general independent and living skills language was written by the witness. The language in the student's prior IEP, concerning driver training and undertaking chores at home, was simply repeated from the previous IEP (P548). The IEP contained no goals in independent living. The student had met his communication goals and they were removed from the IEP (P561).

PTX's senior IEP (EXH. 32) did not have any goals of independent living. Mom and the witness participated in a phone conference on February 10th, 2025. The transition program at North Smithfield was discussed and mom was told that the school department was not recommending CCRI as a provider (EXH 36). Mom and Mr. Daignault agreed that current data kept PTX eligible for the IEP and there was no need for further testing (P562). Mr Daignault testified that PTX had taken all of his general education courses and that his IEP was within the normal range (P564).

PTX's goal had been to finish his academic courses and graduate. That goal did not change until toward the end of his senior year. Mom began to talk about transition programs. Mom had, prior to the transition talk, expressed no concern about the goals of his IEP and his goal to graduate with his class (P574, 575). Mr. Daignault thought that life-skills-type-work was something that was done for the student at home. PTX's IEP would not change in March of his senior year, thereby preventing him from attaining his graduation requirements (P577).

d.      Christine Welch

Ms. Welch is employed as the people personnel service director for North Smithfield High School (P547). The witness oversees budgeting for transition services (P650, 651). All the students who fall within the consent decree have to have an IEP and career development plan (P654). It was the responsibility of the school to ensure that the district met the requirements established by RIDE, including those contained in the consent decree (P654).

Ms. Welch is familiar with PTX. The witness does have experience in developing transition IEPs (P671, 672). The consent decree attempts to ensure that students who are intellectually disabled have developed for them IEPs and a career development plan (P679). Ms. Welch testified that students who fall under the consent decree have substantial significant disabilities (P682). The witness does not know how the consent decree defines developmentally disabled. She has determined that students who do qualify for the consent decree have significant cognitive weakness. You have to have cognitive weakness to qualify under the consent decree. Typically a student would be required to have an IQ of 63 or below (P682, 690).

On October 25, 2021 PTX qualified for special education services with a transition IEP (P702). In March of his freshman year, a speaker came to address the freshman concerning self

10

advocacy, job skills, and had students involved in small activities (P707). Independent living was viewed as being responsible for your grades and to log on to the internet campus to check on all assignments (P707, 708). PTX was taking the core 23 credit courses. Completion of these courses was necessary for him to be able to graduate (P708).

Ms. Welch was department chairman for approximately two years while the student was in school, the parents never complained. The witness never heard anything about toilet related issues involving the student (P722).

Mom was told that if conversations were going to center on the transition programs, there would have to be an IEP meeting regarding the following academic year, September, 2025 to June, 2026 (P727). At a meeting on April 23, 2025 mom expressed her interest in the West Bay transition program. She did not want her son to return to the North Smithfield program (P731). Mom agreed to visit the North Smithfield school at sometime (P732, 733).

On about April 25th, 2025 mom wanted to know the location of the transition program in the North Smithfield High School building. She had questions about her son graduating in June.

On June 2nd, 2025 M.A. spoke to Ms. Welch and informed her that her son needed a transition program and that he was not going to graduate in June (P744). The school reached out to mom about scheduling an IEP meeting, but the contact stalled when a due process complaint was filed in July, 2025. Mom had not visited the North Smithfield transition school as of that time.

The school offered an IEP meeting date on September 4th, 2025. At that time, the length of PTX's transition day would change. He would have at least eight hours per week of working with a job coach on a job placement, and by November 2025, PTX had taken four vocational assessments. Moms only complaint about the December, 2025 IEP meeting was that there were

11

not enough strengths listed in his IEP (P802). Ms. Welch testified that the IEP created in December, 2025 was reasonably calculated to enable PTX to make progress. The witness described PTX as "super friendly with others in the class and that his classroom work was considered to be average." Ms. Welch testified that the IEP prepared for PTX in December was appropriate and that North Smithfield was the least restrictive environment for the student (P814).

Ms. Welch testified that there were at least ten school districts that have transition programs in their high school building (P814). There are no formal guidelines from RIDE concerning whether a student falls under the consent decree (P818). PTX is not intellectually disabled. His IQ is 88 (P821). PTX does not have substantial limitations in learning, self care, economics, self sufficiency, or in terms of dressing and eating (p826). Only two percent of the students qualify for alternative assessments as opposed to the basic core curriculum experienced by 98 percent of the students (P845). Common core students would receive a diploma. A student can not finish a common core curriculum, graduate, and finish a sixty day trial work period under the consent decree (P846, 847). A student in a common core curriculum who graduates can not be considered a consent decree kid (P847).

The school department would not change the student's IEP toward the end of his senior year, unless he was coming back for a fifth year transition program(P869). Ms. Welch had rejected CCRI as a transition school by February, 2025 (P870). RIDE is clear that students are tested by common core standards or by alternative assessments. Students with significant cognitive disabilities would not be able to meet the common core standards (P900).

   e.  Eileen Crudele

12

Ms. Crudele's resume was marked as "Exhibit M.M.". She is the director of special education at Smithfield High School (P915). She is a certified special education administrator (P918). The consent decree is an agreement between the Department of Justice,  RIDE, and others (P926). Person Centered Planning examines the individual qualities of a person and their interests. It considers strengths, challenges, hopes, and dreams of the person (P931). A transition page in an IEP mirrors "with Person-Centered Planning to make both of these documents the same." (P935).

There was nothing in the IDEA that required the IEP team to analyze whether a student should qualify under the consent decree (P939). PTX is not intellectually disabled under the consent decree (P944). His file showed a developmental disability with his autism diagnosis, but the witness would not place him under the auspices of the consent decree.

The IEP looks at measurable post-school goals. This analysis takes into account what the student would like to do in three areas; education and training, employment, and independent living. When this subject matter is being discussed in an IEP meeting, it can be talked about by all members of the team (P960, 961).

From age fourteen on, the district is supposed to consider transition assessments. The school would not formally assess independent living skills, but might count on information that pertains to observations to the student in school (P973, 974). It does not appear that the parents were asked to rate their child's independence (P983). The witness thinks that this discussion would take place regarding all the people in the IEP meeting. Ms. Crudele addressed the definition of individuals with intellectual and developmental disabilities during her testimony (Exh. 45, P3). The witness testified unequivocally that a student has to have some intellectual disability in order to fall under the consent decree.

6. <u>Analysis of Evidence</u>

The petitioner's claim relates to his contention that he did not receive appropriate transition services while he was a special education student at North Smithfield high school from September, 2021 to September, 2025. In conjunction with this claim, the petitioner contends that his transition services should include those relating to developmentally disabled students as addressed in Exhibit 45 (the consent decree).

A student's educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular class room. The goals may differ, but every child should have the chance to meet challenging objectives. *Andrew F. vs Douglas County School District 580US386,402*. A focus on the particular child is at the core of the IDEA. Instruction often must be specially designed to meet the child's unique needs to an individualized education program <u>id400.</u>

The parties in this case agree on three things. First, PTX is not intellectually disabled; second, he has a developmental disability; third, his developmental disability is identified as autism spectrum disorder. The parties disagree concerning whether the petitioner's developmental disability substantially impaired three or more of the below mentioned life activities.

A developmental disability is defined in the consent order as people who are eligible, or likely to be found eligible, for public funding under The Behavioural Healthcare Developmental Disabilities and Hospital (BHDDH law). As defined in RIGL 40.1-21-4.3 (5) program under the aforementioned Rhode Island statute, developmentally disabled include people, eighteen or over,

14

who have substantial functional limitations in three or more of the following major life activities: a. self care, b. receptive and expressive language, c. learning, d. mobility, e. self direction capacity, f. independent living, and g. economic. In order to analyze substantial impairments, if any, that PTX has in major life activities it is necessary to review psychological and neuropsychological exam results based on previous examinations.

PTX attended North Smithfield high school from September 2021, to September 2025. He went to parochial school in first through eighth grade, and had a 504 Plan in effect at that time. In the summer, 2019 PTX was administered a pediatric neurophysiological exam and the report is marked as Exhibit 1. PTX's presenting problems were developmental delay including concerns about social function, restricted range of interest, as well as difficulty with organization, perseveration, and difficulty with hand writing (Exhibit 1, P1).

On October 5th, 2021 PTX qualified for special education services with a diagnosis of ASD (Exhibit 4). A school psychological evaluation was prepared in February 2022. The BASC-3 items endorsed by student's teachers resulted in a finding of clinically significant depression, anxiety, and somatization scores. This profile typically indicates high levels of internal distress, such a depressive mood, anxiety, and a low self esteem, as well as physical complaints, such as headaches, stomach aches, lethargy, and pain. Additionally, the student elevations on the sense of inadequacy and self-reliance scales may suggest low achievement expectations, problems in self-confidence, a lack of perseverance, and a perception of being un-successful (Exhibit 13, P9).

The student underwent a neuropsychological examination on September 28th, 2023. The report, Exhibit 22, read in part:

PTX has also had difficulty following multi-step instructions in managing daily adaptive skills. For example, his mother noted he has particular difficulty using the hamper in his room

15

and will leave his clothes on the floor. Although he does better with tooth brushing routines, he tends to resist showering and using deodorant. The student typically prefers to wear the same thing, and will not care if it's backwards or smells. His mother has to cut his fingernails for him. Within the house, PTX will assist by emptying the dishwasher and taking out the recycling. He is able to do some basic food preparation, such as making a quesadilla and macaroni and cheese. He struggles to understand money. He previously tried working a dishwasher, but was easily distracted.

The student's IEP for the period November, 2023 to November, 2024 in addressing independent services read that the student should discuss with his family part time job opportunities and log into the internet campus weekly. This IEP was prepared two months after PTX had taken the neuropsychological test referred to above. The students goals in the IEP, Exhibit 24 page 4, were referenced as math, writing, speech and language (Exhibit 24). In a November 8th, 2023 meeting (Exhibit 26) mom advised Mr. Daignault that she was seeking guardianship of her son.

On September 18th, 2024 Mr. Daignault and M.A. had a telephone conversation. The subject of the conversation was PTX's eligibility for special education services. Although his three year evaluation was due, he did not require any testing to stay eligible for services. Mom agreed to PTX's program and no further testing was required to remain eligible for special education services (Exhibit 29). The independent living entries in the November 27th, 2023 to November 26th, 2024 IEP (Exhibit 24) were merely repeated from the previous IEP.

On October 24th, 2024 PTX took the Casey Life Skills assessment. The results were rejected by mom and her expert, Dr. Potemri, because PTX was the only individual who responded to the assessment. The assessment accuracy depended on a number of other people's responses, in addition to the students.

Exhibit 36 documents a phone conversation between Mr. Daignault, Ms. Welch, and mom on February 10th, 2025. Both school officials in the conversation agreed that a fifth year in

16

a transition program at North Smithfield would be a "great fit". Ms. Welch advised mom that North Smithfield had their own transition program and that there was no need to consider CCRI. This telephone conversation represented the first time that mom had been advised by representatives at North Smithfield that if her son graduated in June, 2025 he would no longer be eligible to receive special education services. From March to early September, 2025 neither side moved off their position concerning where fifth year transition services should be provided.

A determination is made that PTX is substantially impaired in major life activities of self care, self direction, capacity for independent living, and economics. The results of the sensory motor and cognitive analysis on September 28, 2023, as quoted above, relate directly to independent living, self care, and self direction issues. The student's IEP from November 27th, 2023, to November 26th 2024 addressed independent living topics of part time employment and obtaining a drivers license. These objectives are not even remotely related to services that should be provided to the student so as to enable him to perform rudimentary tasks such as, tying his shoes, cutting his food, to utilizing fasteners like buttons and zippers. PTX was observed at home leaving clothes on the floor, resisting showers, and failing to use deodorant when necessary.

PTX's teachers who see him occasionally in school do not have a chance to observe him at home and other locations outside of the school setting. PTX is far from being able to live independently and the neuropsychological examination administered on September 28th, 2023 bore this out. Given the neuropsychological findings, the lack of independent goals, and transition services in the IEP covering the student's senior year are striking. PTX should not have trouble tying his shoes, fastening his pants, and refraining from putting legos in his mouth as he enters his last year of high school.

17

A review of the testimony of Ms. Welch and Ms. Crudele suggests for a child to be developmentally disabled he must also have a substantial cognitive impairment. PTX is a perfect example of a student with no cognitive intellectual impairment who is developmentally impaired. Furthermore, the student's condition as described qualifies him for consent decree inclusion. The fact that the student was not found by the respondent to be eligible to be covered by the consent decree means that he did not benefit from a career development plan, an individual learning plan, and Person Centered Planning all of which is applicable to the consent decree. The Person Centered Planning on Exhibit 45 page 3 brings in to play an employment plan team who assists the student in the Person Centered Planning. The teams described herein helped make plans, create goals and services needed to attain the goals. These plans are in addition to, and not instead of, an individual education plan. PTX was at a distinct disadvantage not having received services outlined in the consent decree.

The age transition in Rhode Island begins at age fourteen. 300.3.0(7)(b)(1)(2).

Transition services for a child with a disability, beginning at the age of 14, or younger if determined appropriate by the IEP team, and updated annually, thereafter, the IEP must include one, appropriate measurable post secondary goals based upon age appropriate transition assessments relating to training, education, employment and where appropriate independent living skill. And two, the transition services (including courses of study) needed to assist the child in reaching those goals.

Based on testing results there were no productive services that addressed all of the student needs that had been described herein. The only transition assessment arguably related to independent living was proven to be invalid because the student was the only individual who participated in the assessment. Other documentation referenced in this memorandum suggests that PTX was not a particularly accurate historian when it came to activities or things he could accomplish.

18

The terms of the consent decree were not applied to PTX. What a disadvantage the student was under in failing to receive the potential assistance provided by the consent decree. The school personnel were preoccupied with intellectual disabilities when the student did not even claim he had one. Determining that PTX did not have a cognitive disorder allowed them to falsely conclude that he did not have a developmental disorder. It was easy for the respondent to ignore the consent decree because they assumed that a developmental disorder required the existence of a cognitive disorder.

The petitioner was born March 9th, 2006. He should have begun receiving appropriate transition services by his fourteenth birthday on March 9th, 2020. The respondent was obligated to consider, and if necessary, provide transition services by the student's fourteenth birthday. The statute of limitations regarding compensatory claims is two years, and began on the petitioner's eighteenth birthday on March 9th 2024. To be clear, any compensatory damages were within that period of March 9th 2024, to the present. The following are deemed to be an itemization of the school department's failure to provide the student with appropriate transition services.

1. The student transition services, and particularly independent living, should have begun when PTX reached his fourteenth birthday.

2. The student should have undergone the process of Person Centered Planning with the assistance from an employment team by age fourteen.

3. A career development plan and individual learning plan should have been provided to the student by age fourteen.

4. The IEP team should have utilized the documents described in paragraphs two and three to prepare an IEP over the years.

19

5.  Mom should have been thoroughly briefed on the critical decision that needed to be made between her son graduating or remaining in school after scheduled graduation to continue with special education services.

6.  Mom should have been advised that the student would have to make a choice earlier in his high school career as to whether his goal was to graduate or receive special education services. Mom had woefully insufficient information to make this decision intelligently.

7.  The decision regarding the December, 2025 IEP was tainted by the school's preconceived decision to send the student to the North Smithfield High School transition program.

Given the above described failure to provide appropriate services particularly independent living services, the petitioner's claim for relief is granted as follow:

1.  A third party provider should be retained to help assimilate all of the Person Center Planning, career development plans, and transition assessments into a fully developed IEP.

2.   The respondent should work toward the end of providing the student with a suitable community based transition program that will not include the program at North Smithfield.

3.  While attending a transition program beginning in September, 2026 the student should receive instruction from a tutor qualified in the area of transition services once a week between September, 2026 and June, 2027.

4.  The IEP team and third party provider should schedule summer services for PTX in the summer, 2027.

20

06/26/2026                                                    *John R. Mahoney*

Date                                                         Hearing Officer

21